*Philadelphia,
Monday,
January 17.*

MEYER and another *against* BARKER.

THIS was an action of covenant upon a charter party, which was tried before *Brackenridge* J. at *Nisi Prius*,

If an original deed, on which suit is brought, is traced from the hands of the plaintiff to his attorney, who believes it to have been lost while in his keeping, a copy may be given in evidence, without affidavit by the plaintiff that he has not got the original.

A charter party was entered into by *B*, acting on behalf of the owners of the ship, almost all the covenants in which were expressed to be made by him as agent for the owners; but the owners were not parties, nor were they *named* in any part of the instrument. At the conclusion the charter party said, "for the performance of all the covenants before mentioned, the said *parties* respec- "tively bind themselves personally each to the other." The vessel, her tackle and apparel, were bound for *the due performance of her owners and agents or agent* to the charterer, and her freight was made payable to the agent or his order. *Held*, that the agent was personally responsible for his covenants.

In an action upon a charter party, the charterer may recover not only the damage he himself sustained, but also the damage occasioned to goods belonging to a person whom the charterer let in. The

in *November* last, when several points were reserved for the consideration of this Court. The case by the report of his honour was thus:

On the 7th of *September* 1805, *Jacob Barker* the defendant, and *George* and *Theodore Meyer*, entered into a charter party of the *American* ship *Diana*, *Samuel Holmes*, master. *Barker* described himself in the charter party as " agent for " and in behalf of the owners" of the ship, and " as agent " aforesaid", for the considerations therein mentioned, " he " granted and to freight let unto the said *G.* and *T. Meyer*, " the *hold* of said ship, reserving usual and sufficient room " for the stowage of cables, provisions, wood and water, " for a voyage to be made from the port of *New York* " to *Amboy* in *New Jersey*, from thence to *Varel*, (and " *Bremen* if it proved to be free of blockade) and at and " from thence back to *New York*, on the terms and condi- " tions therein after mentioned." *Barker* as agent then covenanted that the ship was, and to the best endeavours of her owners &c. should continue, tight, strong &c., and so on through the ordinary covenants on the part of the ship owner. On their part, *G.* and *T. Meyer* covenanted with *Barker as agent*, to use the *hold* of the ship, subject to the reservation aforesaid, to tender and receive the cargo, and to " pay to the said *Jacob Barker* or his order for the same, " 1500*l.* sterling, with five per cent. primage," payable at particular times. The charter thus concluded, " and lastly " for the true and faithful performance of all and sin- " gular the agreements and covenants herein before con- " tained, on the part of *said parties* respectively, *they bind* " *themselves personally* each to the other, and their heirs, " executors, administrators and assigns each to the other, " and the said cargoes are hereby severally bound, for the " payment of the freight, primage and demurrage to the said " ship and owners and their agent or agents; and the said " vessel, her tackle and apparel are hereby bound for the " due performance of her owners, and agent or agents, to the " said *G.* and *T. Meyer.*" It was signed and sealed first by *Jacob Barker*, without any addition, and then by *George Meyer*, and *Theodore Meyer* by his attorney *George Meyer*.

While the cargo was loading at *New York*, the defendant

1814.

MEYER
et al.
*v.*
BARKER.

The *hold* of a ship was chartered by *B* to *A*. *B* afterwards put coffee in the *cabin*, about which a dispute arose, when *C*, who was interested in the charter with *A*, purchased it of *B*, and paid the captain for his cabin privilege. One bill of lading was given for the whole cargo, both that in the *hold* and in the *cabin*, " paying freight as " per charter " party." *Held*, that *B* was bound to pay for the coffee in the *cabin*, lost in consequence of the unseaworthiness of the ship.

A charterer may recover from the ship owner the whole amount of the loss caused by unseaworthiness, notwithstanding underwriters have already without dispute paid part of the loss; that part being recoverable back by the underwriters, as a payment by mistake.

1814.

MEYER
et al.
*v.*
BARKER.

put coffee of his own in the cabin, and a dispute arose whether only the *hold*, or the *whole* ship was chartered; in consequence of this, *Jacob Le Roy* and *Sons*, who were owners of an undivided moiety of the cargo, purchased for the concern the coffee of the defendant, and paid the captain for one half of the cabin which was his privilege; and a bill of lading was signed for the whole cargo, including the coffee in the cabin, paying freight as "*per charter party.*"

The vessel sailed from *New York* upon the voyage, and in consequence of springing a leak, she made a jettison of 402 bags of coffee, including that in the cabin, damaged her cargo, and was obliged in consequence of distress to put into the *Delaware*, and to come up to *Philadelphia*.

Messrs. *Le Roy* and *Sons*, who were insured in *Baltimore*, received the loss there without any dispute. They were also insured in *Philadelphia;* but in a suit against the *Union Insurance Company*, they were defeated on the ground of unseaworthiness. This suit was therefore brought against Mr. *Barker* upon the same ground. The declaration alleged the damage by breach of covenant to have accrued to *G.* and *T. Meyer;* but subsequent to the institution of the suit, it was entered on the record to be also for the use of *Le Roy* and *Sons*.

Upon the trial of the cause, the first question was whether a copy of the charter party could be given in evidence. It was proved that the original had been sent with other papers from *New York*, by *George Meyer*, to the agent of the concern in *Philadelphia*, Mr. *George Harrison*. Mr. *Harrison* delivered the papers as he received them to Mr. *Ingersoll* to bring suit upon, and Mr. *Ingersoll* swore that he received the charter from Mr. *Harrison* on the 26th of *March* 1807, and afterwards delivered it to one of his students, to draw the declaration, which was drawn and filed on the 17th of *August* 1809; that diligent search had been made for the charter party in his office, and from its not being among his papers, he believed that the same had been lost upon the removal of his papers on a change of residence. After the loss was discovered, a second declaration was filed without profert. It was also proved that both the subscribing witnesses were dead, and that notice had been given to the defendant to produce the counterpart. On this evidence, an examined copy, made by the defendant himself, and exhibit-

ed upon a trial in another cause, was offered, and admitted by the judge, reserving the point.

The fact of the loss and damage, and of the entire unseaworthiness of the vessel, was then shewn, and the cause was spoken to, the defendant's counsel making the following objections to the plaintiffs' claim, in addition to their observations upon the question of unseaworthiness: First, that the defendant was not responsible, having acted in the capacity of agent. Secondly, that the plaintiffs could only recover their own loss, and that the loss of Messrs. *Le Roy* and *Sons* could not be included. Thirdly, that no damages could be recovered for the coffee in the cabin, the charter party only embracing the *hold*. Fourthly, that from the entire loss, should be deducted the amount received by *Le Roy* and *Sons* from the underwriters at *Baltimore*. All these points the judge reserved, giving his own opinion at the same time against the defendant upon all, and the jury found a verdict accordingly.

The reserved points were now argued by *Dallas* and *Ingersoll* for the plaintiffs, and by *Tod* and *Rawle* for the defendant.

*Arguments for the plaintiffs*. 1. The copy was good evidence, because the loss of the original was proved as clearly as it could be. There was no necessity for examining the plaintiffs or *Le Roy* and *Sons*, because the paper had been traced out of their hands, and there was no ground for supposing it had ever got back.

2. The defendant was personally responsible. The responsibility of agents depends very much upon the intention of the parties, to be collected from the language used, and from the circumstances attending the transaction. *Barker* is the party; his principals are not named, nor are they bound; the freight is reserved to him or his order; he binds himself in express terms *personally*, and he seals in the character of a principal. There was good reason for requiring his personal liability, because the owners lived out of the state: if he had intended to bind his principals only, he would have named them, signed for them, and given his plaintiffs a recourse to them. For want of this he is personally liable.

MEYER
et al.
*v.*
BARKER.

This is not like the case of *Hodgson* v. *Dexter* (a), nor *Unwin* v. *Wolseley* (b); because there the obvious intention was to look to government, and not to the agent.

3. The damage sustained by *Le Roy* and *Sons* may be recovered in this suit. They were interested from the first. No second suit can be brought upon this charter party, and yet clearly the defendant should make good the whole loss. It can only be done by permitting an entire recovery in this. *Le Roy* and *Sons* were known to the defendants as parties in interest from the outset. They bought the cabin coffee, and paid the captain; and the bill of lading which included the coffee, stipulated for freight as per charter party. This recognized and included their interest.

4. The coffee thrown overboard from the cabin is upon the same footing with other parts of the cargo. It was included in the same bill of lading, which referred to the charter party. After the dispute arose, the defendant by selling the coffee to *Le Roy* and *Sons*, agreed to their interpretation, that the hold meant the entire ship. The bill of lading is evidence of the particular goods to be conveyed according to charter party, and included within it. *Abbot on Ship.* 172.

5. The ship not being seaworthy, the underwriters who have paid a loss, may recover it back, as a payment by mistake. If it is deducted in this suit, and the underwriters then recover it, no further remedy can be had upon the charter party. If the defendant wishes to take defence against those underwriters upon the question of seaworthiness, we agree that he may do it in our name; or we will deduct the amount so paid, from our claim in this suit, on receiving an indemnity against the underwriters.

*For the defendant.*

1. It was not quite clear that the paper sent to Mr. *Harrison* was an original; but before a copy could be evidence, it was necessary to examine the plaintiffs, who had the legal right to possess the original, or to produce their affidavit. There was nothing to shew that it might not have been delivered back to them.

2. *Barker* is not bound personally, because he is bound

(a) 1 *D. & E.* 674.                    (b) 1 *Cran.* 345.

throughout *as agent*, and the plaintiffs treated with him as agent. *Joyce* v. *Sims* (a). It is this circumstance that exempts him. Signing and sealing, *personally* binding, are of no importance; these existed in *Hodgson* v. *Dexter* (b). The term *personally* was used only to guard against an abandonment of the goods for the freight. If it appears that the party covenanted in a representative capacity for his principals, he is exempt. That the owners were not distinctly named is immaterial, as their names might have been ascertained at the custom house; and the bill of lading unquestionably bound them, if the want of an authority under seal, prevented the charter under seal from obliging them. As to the reservation of freight to *Barker*, payment to the owners would have barred him, and they might have maintained suit upon the charter. 2 *Roll. Abr.* 22. *l.* 20., 2 *Lev.* 74.

3. The recovery must be according to the count, which is for damage to the plaintiffs only. At the commencement of the suit, the names of *Le Roy* and *Sons* were not entered in the process, or on the record. The defendant is in the nature of a surety, against whom a remedy should not be extended by implication. *Wright* v. *Russel* (c), *Strange* v. *Lee* (d), *Dance* v. *Girdler* (e), *St. Saviours* v. *Bostock* (f.) The contract binds the ship to *G.* and *T. Meyer.*

4. The cabin was not included in the charter. Even after the dispute, the captain was paid 200 dollars for the cabin, which proves that the charter did not extend to it. If the plaintiffs have a remedy, it is upon the bill of lading against the owners. *Barker* has not undertaken for it.

5. It would be against good faith that the plaintiffs should recover from us, what they had already received from the underwriters. We aver that the vessel was seaworthy; and if this verdict stands, we shall have no opportunity of making good our averment against the underwriters who have once admitted it. The damage of the plaintiffs is only what remains due of the loss, after crediting their receipts.

TILGHMAN C. J. This is an action of covenant on a charter party, by which the defendant, as agent of the owners of the ship *Diana*, let the hold of the said ship on freight to the

*margin:* 1814. MEYER et al. *v.* BARKER.

(a) 2 *Dall.* 224.    (c) 3 *Wils.* 532.    (e) 4 *Bos. & Pul.* 40.
(b) 1 *Cran.* 364.    (d) 3 *East.* 484.    (f) 5 *Bos. & Pul.* 179.

plaintiffs on a voyage from *New York* to *Amboy* in the state of *New Jersey*, thence to *Varel* and *Bremen* in *Europe*, and thence back to *New York*. On the trial at *Nisi Prius* several points of law were reserved, which are now to be decided.

1. The first question is whether a copy of the charter party was properly admitted as evidence. There was no doubt of the copy being well proved, for it was sworn to by one who had compared it with the original, the subscribing witnesses being dead. The only point then is, whether this was a case in which a copy could be admitted at all. The rule is, that before a copy can be received, you must prove the *existence* and *loss* or *destruction* of the original. About the *existence* of the original there was no dispute. Its *destruction* was not alleged. But as to its *loss* there was strong evidence. It was proved that the original had been sent from *New York* by *Le Roy* and *Sons* to their agent Mr. *George Harrison* of *Philadelphia*. Mr. *Harrison* delivered it to Mr. *Ingersoll* to bring suit on, and Mr. *Ingersoll* believes that it was lost at the time of his removing his papers from one house to another in this city. When the declaration was first filed in this cause, it contained a profert of the charter party; but after the loss was discovered, a new declaration was filed in which the loss is alleged. The principal objection to the evidence, is that the oath of the plaintiffs was not taken to prove that the original was not in their possession; but I take this to be unnecessary, because the paper was traced from their hands to the hands of Mr. *Ingersoll*. The evidence of loss after it came to Mr. *Ingersoll's* hands is satisfactory, so that the plaintiffs were let in to the production of the copy.

2. The second point is on the articles of charter party, the defendant contending that he is not liable to an action, because he contracted only in the capacity of an agent. Where one contracts as an agent, and it is understood that the principal *only* is to be looked to, the agent is not liable to an action. This has been decided in the case of agents contracting on behalf of the *British* government, and that of the *United States*. 1 *Term Reports* 674. *Hodgson* v. *Dexter*. 1 *Cranch* 345. The reason is plain. To make the agent liable against the intent of the parties, would be a violation of the contract. It is to be examined then, what was the intent

of the parties to be collected from this charter party. Most of the covenants on the part of the defendant, are expressed to be made by him as agent for the owners of the ship. But towards the conclusion, *for the performance of all the covenants before mentioned, the parties bind themselves to each other respectively*, and the vessel her tackle and apparel are bound for the due performance of *her owners and agents or agent* to the said *G.* and *T. Meyer.* Who are these parties then that thus bind themselves? The owners of the ship are no where named as parties, nor are they even named *at all* in any part of the instrument; nor does the defendant sign as agent or attorney, but in his own name. It appears too, that this difference between signing in one's own name and as attorney was well understood, because *George Meyer* signs first for himself, and then as attorney for *T. Meyer.* It is no uncommon thing for an agent to bind himself personally, looking to his principal for indemnity; and indeed when the principal lives at a distance, as in the present case, it is no more than a just caution in the other party to ask security at home. Considering the whole of this instrument, I think it was intended that the defendant was to be looked to, and therefore he is responsible.

3. The next question is whether damages can be recovered in this action, on account of the loss sustained by *Jacob Le Roy* and *Sons,* who were owners of the cargo? That the defendant ought to be answerable in some form of action, for all damages sustained by the cargo, is without doubt; and I can see no objection to the recovery of the whole in this action. The defendant will not be liable to *Le Roy* and *Sons* in another action, because it is entered on the record, that this action is for their use. It was intended that there should be a remedy for all damages by action on the charter party; but that cannot be, unless the whole is now recovered, because there cannot be two actions on it. The plaintiffs are *trustees,* for the purpose of permitting their names to be used for the benefit of *Le Roy* and *Sons* in this action. No injury is thereby offered to the defendant, justice is done to all parties, and no form of law is violated. The damage sustained by *Le Roy* and *Sons* may, therefore, be taken into consideration in the suit.

4. We are next to consider, whether the charter party

extends to the goods stowed in the cabin. The defendant denies that it relates to any thing out of the *hold*. The objection deserves no favour. It savours too much of the *summum jus*. It was from the defendant himself, that these goods were purchased after they were in the cabin. Could it have been intended then that they should be unprotected by the charter party? It seems there had been some difference of opinion about the meaning of the word *hold*, used in the charter party. Pending this difference, the defendant put his goods in the cabin, but finally the matter was adjusted by the defendant selling the goods. I am for taking the construction put upon the instrument by the parties themselves, and it seems they construed it so as to include the goods put in every part of the ship; this is very clear, because no extra freight was demanded for what was put in the cabin, and the bill of lading expresses that freight is to be paid *according to the charter party*. The whole therefore is to be included in the charter party.

5. The fifth and last objection is, to the recovery of damages to the amount of the *whole* injury sustained, because the plaintiffs had recovered satisfaction for part from the underwriters in *Baltimore*. We must now take for granted, that the jury have decided that the ship was not seaworthy, and therefore the money paid by the *Baltimore* underwriters, may be recovered back as having been paid by mistake. Supposing the unseaworthiness to be granted, it would follow that restitution must be made, and therefore there should be no deduction from the full damages in this case, because what one is bound both by *conscience and law* to do, may be considered as done. But the defendant denies the want of seaworthiness, and therefore he has a right to a trial; he has a right to it, because the plaintiffs being in possession, may retain the money until recovered from them by law, and the defendant having given notice that in his opinion the ship was seaworthy, and that he desires that question to be decided by an action, it would be unjust that he upon whom the loss is to fall, should be refused a trial. If therefore the entry of judgment in this verdict, would have the effect of debarring the defendant of so reasonable a claim, I should be for setting it aside. But this is not the case. The plaintiffs offer to release the amount of what was paid by

the underwriters, upon receiving an indemnification from the defendant; or they offer, if the defendant pays them the whole amount of the verdict, to repay him the amount received from the underwriters, if the underwriters fail in their suit for restitution. The defendant may secure himself by taking his choice of this alternative. I am therefore of opinion that this being done, judgment should be entered for the plaintiffs.

YEATES J. The settled rule of law is, that previous to a party's being permitted to give secondary evidence of the contents of a written instrument, he must give satisfactory proof to the judge that such instrument once existed and is destroyed or lost. No effort should be remitted, which may induce a reasonable presumption that upon further enquiry the original might be obtained.

In the present instance, the existence of the charter party on which this suit is brought, is fully established by the affirmation of the defendant himself, taken under a commission in another cause between other parties, wherein the seaworthiness of the ship *Diana*, during the voyage for which she had been chartered, came in question. *George Meyer*, one of the plaintiffs, declared on oath in open court, that he had forwarded from *New York* to Mr. *George Harrison*, his agent here, the original charter party which had been executed by the defendant, together with other papers in this action; and Mr. *Harrison* swore, that he delivered the identical papers to *Jared Ingersoll* esquire, one of the plaintiffs' counsel, having first taken a list of them in the envelope which is still preserved, wherein the charter paper is marked No. 2. Mr. *Ingersoll* swore that he received those papers from Mr. *Harrison* on the 26th of *March* 1807, and afterwards delivered the charter party to Mr. *Samuel Badger*, a young gentleman who studied the law in his office, in order to draw a declaration thereupon, which was afterwards filed on the 17th of *August* 1809; that the most diligent search had been made for the charter party in his office, and from its not being found amongst his papers, he concluded that the same had been lost in the removal from his former residence in the city on the 17th of *March* 1812. Mr. *Badger* confirmed this statement, and swore that the declaration was

in his handwriting, which he had drawn from the original charter party. Added to this, proof was given that both the subscribing witnesses to the charter party were dead at the time of the trial. Under these circumstances, I think it perfectly correct to admit the proof of the contents to be given in evidence, which was a copy of the instrument testified by the defendant himself to have been compared with the original to serve as evidence in another cause.

It would seem to me to be a work of supererogation to have examined *Theodore Meyer*, the other plaintiff, or *Jacob Le Roy* and *Sons*, to the loss of the original charter party. So far from there being the slightest probability, that this paper had come to the hands of either of those persons, the proof adduced expressly destroys such presumption; because the paper has been traced by ample proof into the hands of Mr. *Ingersoll*, and it is not pretended or suggested that he delivered it over to his clients. If however the defendant had deemed it beneficial to his interest to have examined either of those gentlemen, as to the loss of the original charter party, he had it in his power so to do; because the second declaration averring the loss thereof, was actually filed nearly five months before the trial took place.

It has been strenuously contended by the defendant's counsel, that this charter party does not charge the defendant with individual responsibility. On this part of the case I feel no difficulty whatsoever. I fully agree that the liability of the defendant is to be collected from a fair construction of the whole instrument, and that the intention of the contracting parties must govern our decision. I also admit that he did not let the ship to freight as owner; but it will not be denied, that although he acted for others in this instance, he might bind himself individually. My judgment is not formed on the technical operation of the defendant's seal; though it cannot escape observation, that *George Meyer* has sealed the paper as well for himself as attorney for *Theodore Meyer*, and the defendant immediately afterwards subscribed the same without adding his representative character. This case is distinguishable from *Hodgson* v. *Dexter* in several important particulars. There the official character of the defendant was stated in the description of the parties. The tenement was let to the *said Samuel Dexter*

and his *successors*, to have and to hold the same to him and his *successors*. The covenant for quiet enjoyment during the term is with the said *Samuel Dexter* and his *successors*, and is that they as well as he shall enjoy; and the covenant on which the suit was brought was for himself and his *successors*. The Court there say, that under such circumstances, the intent of the officer to bind himself *personally* must be very apparent indeed, to induce such a construction of the contract. In our case it is true that the defendant is styled *agent* for and in behalf of the *American* ship *Diana*, *Samuel Holmes*, of *Wiscasset*, and the covenants made by him are said to be *as agent;* but the freight of 1500*l.* sterling and demurrage are made payable to the defendant or his order, and in no part of the charter party are the names of the owners introduced. The last covenant is in these words:– " For the true and faithful performance of all and " singular the agreements and covenants herein before con- " tained on the part of *said parties* respectively, they bind " themselves *personally each to the other*, and their heirs, " executors, administrators and assigns each to the other " &c." That the plaintiffs were bound jointly and severally to the defendant, there cannot be the shadow of a doubt. What then is the effect of this clause as to the defendant? We are not at liberty to reject any expression which the contracting parties have made use of. Is it not the plain and obvious meaning of the words cited, that the defendant bound himself in his individual capacity, stripped and separated from his representative character? And will not a different construction render the adverb *personally*, as applied to the defendant, wholly inoperative? To my mind the conviction is irresistible, that the defendant became *personally* responsible for all breaches of the charter party committed or suffered by himself, the owners of the ship, or their captain. We may naturally suppose that in such a case the plaintiffs would prefer a remedy against a person living in the same city with themselves, to a resort for redress to the judicial tribunals of the province of *Maine;* and it is no answer to the observations I have made, to say that the law would afford a remedy to them against the owners of the vessel upon the captain's bill of lading.

It has been further objected, that the plaintiffs are entitled

to recover only such damages as they themselves have received, the contract having been made with them alone, and *Le Roy* and *Sons* not being mentioned therein; and that at all events the defendant was not answerable for the coffee stowed in the cabin, which was afterwards thrown into the sea. The time when *Le Roy* and *Sons* embarked in this concern, does not appear precisely from the evidence; but most probably it was from an early period of the meditated voyage. They purchased from the defendant the coffee which he had procured to be stowed in the cabin, and paid the captain 200 dollars for his privilege therein. They appear to have been jointly interested with the plaintiffs in the whole shipment, and the bill of lading signed by captain *Holmes*, treats all the cargo as a joint concern, and the freight thereof to be paid as per charter party. We cannot suppose with any degree of plausibility that mere strangers could have any claim to interpose in the projected voyage to *Varel* and *Bremen;* but must presume that the whole of the expected profits should be confined exclusively to the plaintiffs and those coming in under them. The defendant's sale of his coffee to *Le Roy* and *Sons*, and the general bill of lading of the captain referring to the charter party, adopt them as principals in the first contract, which cannot now be retracted.

The cabin and hold are certainly distinct portions of a ship; but a part may under some circumstances be used as referring to the whole, without any violation of language. Here if a misunderstanding prevailed between the parties in the first instance about the cabin, it was settled by an amicable accommodation, and the adverse claim of every person interested therein was removed. But if even the original contract and subsequent agreement should be deemed inoperative to secure the cabin to the plaintiffs, whose fault was it that the coffee was permitted to remain there? Unquestionably of the captain, who in such case should have shifted the coffee into the hold of the ship. The plaintiffs ought not to sustain a damage by the misconduct of an agent over whom they had no control.

The only question remaining to be considered, is whether the verdict is not given for too large a sum? In other words, whether the defendant ought not to have been allowed credit

for the monies admitted to have been paid to the plaintiffs, by the underwriters on the policies effected on the cargo in *New York* and *Baltimore?* Serious difficulties attend this point on either side, and it is evident that injustice will be done, unless the Court interpose their summary powers. The recovery here is founded on the defendant's warranty of the seaworthiness of the ship, which the verdict of the jury affirms to have been broken; but in such cases the losses voluntarily settled by the underwriters, may be recovered back as payments made by mistake. It is perfectly clear that the plaintiffs are not entitled to a double compensation for their damages, and it is equally clear that in case of the money being recovered back, they could maintain no new suit against the defendant on this charter party. Against the defendant the underwriters have no cause of action; but the defendant should be at liberty to contest the seaworthiness of the ship with those underwriters, if they should choose to do so. The plaintiffs' counsel have offered to give the defendant credit for the sums they have received, provided he will indemnify them against all future claims by those underwriters. This seems to me to reach the justice of this case, and, subject to that restriction and modification, I am of opinion that the judgment should be rendered for the plaintiffs.

BRACKENRIDGE J. concurred.

Judgment for plaintiffs.